IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| J & J Sports Productions, Inc., ) | |
| ) | Civil Action No. 3:16-1118-MBS |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER AND OPINION** |
| ) | |
| El-Corona, a South Carolina nonprofit ) | |
| corporation, d/b/a Taqueria Abierto, d/b/a ) | |
| Tropicana Discotheque, a/k/a El Tropicana ) | |
| and Elsie Acosta, a/k/a Elsie Acosta ) | |
| Sanchez, ) | |
| ) | |
| Defendants. ) | |

On April 11, 2016, Plaintiff J & J Sports Productions, Inc. ("J & J Sports"), filed an action in this court against Defendants El-Corona and Elsie Acosta, collectively doing business as Taqueria Abierto and/or Tropicana Discotheque and/or El Tropicana ("El-Corona"). Plaintiff alleges that it owned the exclusive television distribution rights for a boxing match, and that Defendants exhibited the fight at a commercial establishment without paying a licensing fee to Plaintiff. Plaintiff has asserted claims under the Communications Act, 47 U.S.C. § 605, and the Cable Communications Policy Act, 47 U.S.C. § 553, as well as a state law claim for conversion. Neither Defendant filed an answer or otherwise responded to Plaintiff's complaint. On June 13, 2016, in response to Plaintiff's request, the clerk entered default as to both Defendants. On June 29, 2016, Plaintiff filed a motion for default judgment.

## **FACTS**

The following facts are alleged in Plaintiff's complaint (ECF No. 1), and due to Defendants' default, are accepted as true: Defendant Elsie Acosta ("Acosta") is the owner, chief

1

executive, member, principal, alter ego, manager, agent, and/or representative of El-Corona. *Id.* at 2. Defendant had dominion, supervisory control, oversight, and management authority over El-Corona. *Id.* at 3.  J & J Sports Productions, Inc., a California corporation, purchased the exclusive television distribution rights to "Manny Pacquio v. Timothy Bradley, II WBO Welterweight Championship Fight Program" ("Championship Fight"), which took place on April 12, 2014. *Id.* at 3. Defendants, or their agents, unlawfully intercepted, received, published, divulged, and exhibited the Championship Fight at the time of its transmission with full knowledge that they were unauthorized to do so. *Id.* at 4. This interception was done willfully and for the purposes of commercial advantage or financial gain. *Id.* Defendants were present during and participated in this misconduct. *Id.*

The following facts are set forth in a sworn affidavit of private investigator, John Taylor (ECF No. 10-4):  John Taylor paid a $30.00 cover charge and entered El-Corona on April 13, 2014, at 12:26 am. *Id.* Inside El-Corona, Taylor observed the third round of the Championship Fight being shown unlawfully on an 84" projection. *Id*. Taylor states that the approximate capacity of the establishment was between 125-150 persons and at the time of his appearance, he counted approximately 114 persons in El-Corona. According to a sworn affidavit by Plaintiff's president, Joseph Gagliardi, based on a capacity of not more than 150 persons, it would have cost $3,200 for El-Corona to purchase the rights to exhibit the Championship Fight.  ECF No. 10-3 at 3.

## **DISCUSSION**

### A.    **Liability**

Under 47 U.S.C. § 605(a), "no person receiving . . . any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception . . . to any person

2

other than the addressee, his agent, or attorney." Any person aggrieved by such a violation may bring a civil action to obtain an injunction and to recover damages, costs, and attorney fees. 47 U.S.C. § 605(e)(3). The aggrieved party may recover actual damages or statutory damages between $1,000 and $10,000 for each violation. 47 U.S.C. § 605(e)(3)(C)(i). Furthermore, if the court finds that "the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain," the court may increase the damages by an amount not more than $100,000 for each violation. 47 U.S.C. § 605(e)(3)(C)(ii).

Under 47 U.S.C. § 553(a)(1), "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). Any person aggrieved by such a violation may bring a civil action to obtain an injunction and to recover damages, costs, and attorney fees. 47 U.S.C. § 553(c). The aggrieved party may recover actual damages or statutory damages between $250 and $10,000 for all violations involved in the action. 47 U.S.C. § 553(c)(3)(A). Furthermore, if the court finds that "the violation was committed willfully and for purposes of commercial advantage or private financial gain," the court may increase the damages by an amount not more than $50,000. 47 U.S.C. § 553(c)(3)(B).

The Seventh Circuit has held that § 605 and § 553 employ mutually exclusive categories, specifically that a "communications service offered over a cable system" is not a "radio communication." *United States v. Norris*, 88 F.3d 462, 469 (7th Cir. 1996). In other words, a person who steals cable services at the point of delivery is liable only under § 553, even if the signals were transmitted by radio at some earlier point. On the other hand, the Second Circuit has disagreed and held that some cable transmissions may also constitute "radio communications"

3

under § 605. *International Cablevision, Inc. v. Sykes*, 75 F.3d 123, 133 (2d Cir. 1996). The Fourth Circuit has not considered the question, but consistent with other courts in the District of South Carolina, this court finds that the reasoning of *Norris* to be more persuasive. *See Columbia Cable TV Co., Inc. v. McCary*, 954 F. Supp. 124 (D.S.C. 1996).

As a result, Defendants are liable under § 605 only if they exhibited radio communications without authorization and liable under § 553 only if they received cable communications without authorization. Plaintiff admits that it has not determined how Defendants received the Program, whether through radio or cable, but argues that there is no way to make such a determination without the benefit of discovery. ECF No. 9-1 at 4. Having been denied the benefit of discovery, Plaintiff requests to proceed under § 605. *Id.* The court finds this to be a reasonable solution. The court finds that Defendants violated 47 U.S.C. § 605 by exhibiting interstate radio communications without authorization to customers at a commercial establishment. Furthermore, based on Plaintiff's well-pleaded allegations, the court finds that the violation was committed willfully and for the purposes of commercial advantage or financial gain.

Plaintiff has indicated its choice to proceed under § 605, and in the event that a judgment is granted under said statute, withdraw its other causes of action. ECF No. 10-1 at n.1. Therefore, the court will address damages only under § 605.

**B.     Damages**

Plaintiff elects to recover statutory damages under 47 U.S.C. § 605(e)(3)(C)(i)(II). Plaintiff seeks an award of $10,000, the maximum authorized amount. As explained above, it would have cost $3,200 for Defendants to purchase the rights to exhibit the Championship Fight at El-Corona. The court finds that an award of $3,200 fairly approximates the actual harm to Plaintiff resulting from Defendants' unauthorized exhibition of the Program.

4

Plaintiff also seeks enhanced damages under 47 U.S.C. § 605(e)(3)(C)(ii) because Defendants' violation was committed willfully and for the purposes of commercial advantage or financial gain. Plaintiff requests $100,000, the maximum authorized amount. Plaintiff argues that it loses much revenue due to unauthorized commercial exhibition of its boxing programs because legitimate bars and restaurants cannot afford to compete with "pirate" bars and restaurants. Plaintiff explains that due to the significant costs of purchasing its programs, legitimate bars and restaurants typically must charge a cover fee or otherwise raise food and drink prices when they are showing the programs. Plaintiff argues that pirate bars and restaurants gain a competitive advantage because they are able to show the programs without charging cover fees or raising prices. Plaintiff further contends that requiring the violator to pay only what it would have cost to license the program originally does nothing to deter such violations, particularly when there is a chance of avoiding detection.

The court agrees that an enhanced award is necessary to deter the willful piracy of Plaintiff's programs. The court finds that enhanced damages in the amount of three times the basic statutory damages, or $9,600, provides just and adequate deterrence for such willful violations. Accordingly, the court awards total damages in the amount of $12,800.

**C.     Costs and Attorney Fees**

The court "shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 605(e)(3)(B)(iii). Because Plaintiff is an aggrieved party that has prevailed, it is entitled to recover costs and attorney fees. Plaintiff submitted an affidavit from its South Carolina counsel in support of its request for costs and attorney fees. ECF No. 12-6; ECF No. 12-7.

5

In this default matter, no one has appeared to challenge the attorney fees Plaintiff seeks. Nonetheless, in determining what constitutes a reasonable number of hours and the appropriate hourly rates, the court must consider the following factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney fees awarded in similar cases. *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir. 1978). Although the court must consider all twelve of the factors, the court is not required to rigidly apply these factors, as not all may affect the fee in a given case. "[T]hese factors should be considered in determining the reasonable rate and the reasonable hours, which are then multiplied to determine the lodestar figure which will normally reflect a reasonable fee." *E.E.O.C. v. Servo News Co.,* 898 F.2d 958, 965 (4th Cir. 1990). In determining whether a rate is reasonable, the court is to consider "prevailing market rates in the relevant community." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).

The information Plaintiff provided, coupled with the court's knowledge of rates in work of this type in this district, supports attorney fees in the amount of $1,531.25. Based on the information and supporting documents before the court at this time, the court concludes that the judgment against Defendants should include an award of costs and attorney fees in the amount of $2,096.25 ($565 costs plus $1,531.25 attorney fees).

## **CONCLUSION**

Plaintiff's motion for default judgment is granted. The court finds that Defendants willfully violated 47 U.S.C. § 605. Judgment in favor of Plaintiff is entered against Defendants, jointly and severally, in the amount of $14,896.25, comprising $12,800 in damages and $2,096.25 in costs and attorney fees.

**IT IS ORDERED.**

/s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

July 19, 2016